1
2
3
4
5
6
7
8
9

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AI CA LLC,<br><br>                              Plaintiff,<br><br>v.<br><br>CREDIAUTOUSA FINANCIAL<br>COMPANY LLC, et al.,<br><br>                              Defendants. | Case No. 20-cv-2352-MMA (AHG)<br><br>**ORDER DENYING DEFENDANTS'<br>MOTION FOR SUMMARY<br>JUDGMENT AND**<br><br>[Doc. No. 31]<br><br>**DENYING PLAINTIFF'S MOTION<br>FOR SUMMARY JUDGMENT**<br><br>[Doc. No. 32] |

        Plaintiff AI CA LLC ("Plaintiff" or "AI") brings this action against Defendants CrediautoUSA Financial Company LLC ("CrediAuto") and Rafael Gomez ("Gomez" and collectively with CrediAuto, "Defendants"), asserting one cause of action for conversion. *See* Doc. No. 1 ("Compl."). On June 2, 2022, Plaintiff and Defendants filed cross-motions for summary judgment. *See* Doc. Nos. 31, 32. Both motions are fully briefed. *See* Doc. Nos. 35–38. The Court found these matters suitable for determination on the papers and without oral argument pursuant to Civil Local Rule 7.1.d.1. *See* Doc. No. 39. For the reasons set forth below, the Court **DENIES** Defendants' motion for summary judgment and **DENIES** Plaintiff's motion for summary judgment.

# I. Background[1]

CrediAuto is a company that provides assistance to individuals without credit history or with credit challenges in obtaining automobile financing. Doc. No. 36-1 ("Defendants' Separate Statement" or "DSS") No. 1. Gomez was the founder and CEO of CrediAuto. DSS No. 2. In June 2015, CrediAuto entered into a capital facility arrangement with Varadero Capital LP ("Varadero Capital") to obtain up to $75 million to purchase automobile Retail Installment contracts ("RICs"). DSS No. 3. By late 2016, CrediAuto began seeking alternate means of funding to replace Varadero Capital and obtain additional funds to originate new RICs. DSS No. 4.

Arena Investors LP ("Arena") is an entity that specializes in asset-backed lending. Doc. No. 35-1 ("Plaintiff's Separate Statement" or "PSS") No. 2. In late 2017, Arena and CrediAuto began negotiating a financing agreement. DSS No. 5. As part of the transaction, Arena formed Plaintiff AI and CrediAuto formed AI Causa, LLC ("AI Causa"). PSS No. 3. Specifically, AI was formed to function as the lender and AI Causa was formed to be the borrower. DSS Nos. 9, 12. After lengthy negotiations, AI, CrediAuto, and AI Causa entered into a credit agreement whereby AI would extend a loan facility to CrediAuto and AI Causa of up to $20 million for specific uses. PSS No. 5; DSS No. 6. On March 20, 2018, the parties amended the agreement (the "Credit Agreement"). PSS No. 6; Doc. No. 32-2 ("Dixon Decl.") Ex. E.

The purpose of the Credit Agreement was to enable AI Causa and CrediAuto to purchase and originate RICs, specifically, subprime auto loan contracts. PSS No. 8; DSS No. 13. Pursuant to the terms of the Credit Agreement, CrediAuto was responsible for the servicing obligations associated with collections on the RICs and origination of new

---

[1] These material facts are taken from the parties' separate statements and responses thereto, as well as the supporting declarations and exhibits. These facts are undisputed unless otherwise noted. To the extent a party disputes a fact but does not provide a relevant basis or explanation for doing so, the Court presumes the fact is undisputed. Particular material facts that are not recited in this section may be discussed *infra*. Facts that are immaterial for purposes of resolving the current motion are not included in this recitation.

RICs on AI Causa's behalf.  DSS No. 11.  AI Causa had no employees, no overhead, and no operating expenses, *see* Dixon Decl. Ex. B ("Gomez Depo. II") 79:11–14, and was merely a special purpose vehicle to hold the portfolio of RICs purchased with the funds advanced under the Credit Agreement.  DSS No. 10; PSS No. 16.  In exchange, AI held a security interest in AI Causa's assets, including income.  PSS No. 20.

In March 2018, AI loaned AI Causa $3,393,200 (the "Loan Funds").  DSS No. 13; PSS No. 19.  After fees, $3,000,000 was used by AI Causa to purchase a RIC portfolio from Valdero as well as CrediAuto's own portfolio of RICs (the "RIC Portfolio").[2]  DSS Nos. 13–14; Dixon Decl. Ex. I.

The Credit Agreement specified how the proceeds of the RIC Portfolio were to be distributed on a monthly basis in order of priority, informally known as a "waterfall" provision.  *See* PSS No. 9; Credit Agreement Section 2(j).  Pursuant to section 2(j)(viii), AI Causa was eighth, and last, in line to receive a distribution during the borrowing period, *see* Dixon Decl. Ex. A ("Gomez Depo. I") 74:21–23, specifically "to fund the acquisition of any Eligible Assets pledged as Collateral."  Credit Agreement Section 2(j)(viii).  "Eligible Assets" refers to RICs that meet specific criteria and "Collateral" refers to all of AI Causa's assets.  DSS No. 19.

According to the undisputed record, $1,008,385 of the RIC Portfolio proceeds distributed pursuant to Section 2(j)(viii) was used to pay CrediAuto's operational expenses (the "Converted Funds").  DSS No. 22; Dixon Decl. Ex. G ("Caroprese Depo.") 26:19–24.

By November 2018, the parties' relationship had deteriorated.  On November 21, 2018, AI sent a Notice of Event of Default to Defendants based in part on Defendants' the use of the RIC Portfolio proceeds.  DSS No. 25; PSS No. 31; Dixon Decl. Ex. W; Gomez Decl. Ex. B.  On February 28, 2019, AI sent Defendants a Notice of Default and

---

[2] To the extent the parties dispute whether the initial use of the Loan Funds was permissible under the Credit Agreement, *see* DSS No. 14, such a dispute is immaterial to the present action and motions.

Acceleration.  PSS No. 32; Dixon Decl. Ex. X; Gomez Decl. Ex. C.  The parties attempted to resolve their dispute but were unsuccessful.  DSS No. 26.  Ultimately, CrediAuto and AI Causa filed for bankruptcy,[3] and on February 19, 2020, AI served a UCC 9-620 foreclosure notice and proposal to accept the collateral in full satisfaction of the debt.  DSS No. 27; Gomez Decl. Ex. F.  Defendants did not object and AI took ownership of the collateral.  DSS No. 29.

## II. LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 56, "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."  Fed. R. Civ. P. 56(a).  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *Id.*

The party seeking summary judgment bears the initial burden of establishing the basis of its motion and of identifying the portions of the declarations, pleadings, and discovery that demonstrate absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party has "the burden of showing the absence of a genuine issue as to any material fact, and for these purposes the material it lodged must be viewed in the light most favorable to the opposing party."  *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970).  A fact is material if it could affect the outcome of the suit under applicable law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party.  *See id.*  If the moving party does not bear the burden of proof at trial, he may discharge his burden of showing no

---

[3] CrediAuto and AI Causa's bankruptcy petitions have since been dismissed.  *See* DSS Nos. 26–27.

genuine issue of material fact remains by demonstrating that "there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

The party opposing summary judgment cannot "'rest upon the mere allegations or denials of [its] pleading' but must instead produce evidence that 'sets forth specific facts showing that there is a genuine issue for trial.'" *Estate of Tucker v. Interscope Records, Inc.*, 515 F.3d 1019, 1030 (9th Cir. 2008) (quoting Fed. R. Civ. P. 56(e)).  Moreover, "a party cannot manufacture a genuine issue of material fact merely by making assertions in its legal memoranda." *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co., Inc.,* 690 F.2d 1235, 1238 (9th Cir. 1982).

Where cross-motions for summary judgment are at issue, the court "evaluate[s] each motion separately, giving the nonmoving party in each instance the benefit of all reasonable inferences." *ACLU of Nev. v. City of Las Vegas,* 466 F.3d 784, 790–91 (9th Cir. 2006) (citations omitted).  That said, "the court must consider each party's evidence, regardless under which motion the evidence is offered." *Las Vegas Sands, LLC v. Nehme,* 632 F.3d 526,532 (9th Cir. 2011).  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## III. APPLICABLE LAW

### A.   Choice of Law

As an initial matter, the parties disagree on whether California or New York law applies.  *See* Doc. No. 31-1 at 19–21; Doc. No. 32-2 at 11.  Because the Court sits in diversity over this action, the conflicts laws of the forum state—California—are used to determine which state's substantive law applies.  *See Fields v. Legacy Health Sys.*, 413 F.3d 943, 950 (9th Cir. 2005); *see also CRS Recovery, Inc. v. Laxton*, 600 F.3d 1138, 1141 (9th Cir. 2010).  Like federal courts in the Ninth Circuit, California state courts look to the Restatement (Second) of Conflicts of Law (1971) for the choice of law rules.  *See In re Zukerkorn*, 484 B.R. 182, 188 (9th Cir. 2012); *Nedlloyd Lines B.V. v. Superior*

*Court*, 11 Cal. Rptr. 2d 330 (Cal. 1992).  Section 187 of the Restatement applies if parties have entered into an agreement, negotiated at arm's-length, which selects a particular state's law to govern their contractual relationship.  *See Nedlloyd*, 11 Cal. Rptr. 2d at 332. The principles set forth in section 187 "reflect[] a strong policy favoring enforcement of such provisions."  *Id.* at 333.

To determine whether a choice-of-law provision is enforceable, a court must engage in a two-step analysis.  First, the Court must determine whether: (1) the chosen state has a substantial relationship to the parties or their transaction, or (2) there is any other reasonable basis for the parties' choice of law.  *Id.* at 334.  Second, if either is shown, the Court must next determine whether the chosen state's law is contrary to a fundamental policy of California.  *Id.*

The Credit Agreement contains a choice-of-law provision, designating New York as the applicable law.  *See* Credit Agreement Section 8(j).  Because Defendants advocate for application of New York law pursuant to the choice-of-law provision, they have the burden of establishing first either a substantial relationship or reasonable basis.  *See Yeiser Research & Dev. LLC v. Teknor Apex Co.*, 281 F. Supp. 3d 1021, 1036 (S.D. Cal. 2017) (first citing *Pulte Home Corp. v. Am. Safety Indem. Co.*, 268 F. Supp. 3d 1091, 1095 (S.D. Cal. 2017); and then citing *Wash. Mut. Bank v. Superior Court*, 103 Cal. Rptr. 2d 320 (Cal. 2001)).

But for the Credit Agreement, neither party has submitted or pointed to any evidence on this issue.  Nonetheless, it appears undisputed that Plaintiff is a Delaware limited liability company with a principal place of business in New York, NY.  *See* Compl. ¶ 1; Doc. No. 31-1 at 21; *but see* Doc. No. 6 ("Ans.") ¶ 1 (denying the allegation).  And the parties agree that CrediAuto is a California limited liability company with its principal place of business within the Southern District of California. *See* Compl. ¶ 2; Ans. ¶ 2.  The parties seemingly dispute Gomez's citizenship.  *See* Compl. ¶ 3 (alleging that Gomez is a citizen of California); Ans. ¶ 3 (denying the allegation).

Defendants assert that Plaintiff's principal place of business in New York satisfies the substantial relationship prong.  *See* Doc. No. 31-1 at 21.  However, Defendants point to no law supporting this conclusion.  *Cf. Hambrecht & Quist Venture Partners v. Am. Med. Internat., Inc.*, 46 Cal. Rptr. 2d 33, 41 (1995) ("It does not matter that, although incorporated in the chosen state, a party may have its principal place of business in the forum state . . . ."); *Nedlloyd*, 11 Cal. Rptr. 2d at 335 (holding that the *incorporation* of one of the parties in the designated choice of law state prides the required "substantial relationship").  Nonetheless, Plaintiff's principal place of business in New York provides a reasonable basis for the parties' choice of law.  *See Tutor-Saliba Corp. v. Starr Excess Liab. Ins. Co., Ltd.*, No. CV 15-1253 PSG (RZX), 2015 U.S. Dist. LEXIS 189425, at *8 (C.D. Cal. Apr. 23, 2015) ("Because one of the contracting parties had its principal place of business in New York at the time of contracting, the Court concludes the parties had a 'reasonable basis' for selecting New York law to govern their contact.") (citing *Consul Ltd. v. Solide Enterprises, Inc.*, 802 F.2d 1143, 1147 (9th Cir. 1986)).  Accordingly, the first step of the analysis is satisfied.

"Once the party advocating application of a choice-of-law provision has met its burden, the burden shifts to the opposing party to show that application would violate a fundamental policy of California."  *Yeiser Research.*, 281 F. Supp. 3d at 1036.  If the chosen state's law is contrary to a fundamental policy of California,

> the court must then determine whether California has a "materially greater interest than the chosen state in the determination of the particular issue …." (Rest., § 187, subd. (2).) If California has a materially greater interest than the chosen state, the choice of law shall not be enforced, for the obvious reason that in such circumstance we will decline to enforce a law contrary to this state's fundamental policy.

*Nedlloyd*, 11 Cal. Rptr. 2d at 334.

Plaintiff does not argue, and the Court does not find, that New York law on conversion is contrary to a fundamental policy of California.  Accordingly, the Court

finds that the Credit Agreement's choice-of-law provision designating New York as the applicable substantive law is enforceable.

Seemingly anticipating this result, Plaintiff also argues that because its claim sounds in tort, the choice-of-law provision does not apply. Doc. No. 36. However, Plaintiff AI cites to no authority in support of its position. Moreover, California courts will apply an enforceable contractual choice-of-law provision to all claims "arising from or related to that agreement, regardless of how they are characterized . . . ." *Nedlloyd*, 11 Cal. Rptr. 2d at 337. This is especially true when "the legal relationship between the[] parties emanates from th[e] Agreement and the interpretation of the Agreement will be a central issue" in the case. *Olinick v. BMG Ent.*, 42 Cal. Rptr. 3d 268, 278–79 (Cal. Ct. App. 2006). In this case, Plaintiff's conversion claim arises from the Credit Agreement. To be sure, Defendants would not have had access to the Converted Funds if not for Plaintiff AI's extension of the Loan Funds under the Credit Agreement. Further, the legal relationship between the parties emanates from the Credit Agreement and Plaintiff's claim for conversion is "inextricably intertwined with the construction and enforcement of th[at] Agreement." *Id.* at 279; *see also Yeiser Research*, 281 F. Supp. 3d at 1037 (applying Delaware law to the plaintiff's remaining claims, including conversion). Accordingly, New York law applies to Plaintiff's claim for conversion.

**B.    Conversion**

Under New York law, "[c]onversion is the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights." *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 403–04 (2d Cir. 2006) (quoting *Vigilant Ins. Co. of Am. v. Hous. Auth.*, 87 N.Y.2d 36, 44 (1995)). The "[t]wo key elements of conversion are (1) plaintiff's possessory right or interest in the property and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights." *Colavito v. N.Y. Organ Donor Network, Inc.*, 8 N.Y.3d 43, 50 (2006) (internal citations and quotation marks omitted). "When a defendant's possession of the property was initially lawful, there is no conversion unless the defendant refuses the

owner's demand to return the property or wrongfully transfers or disposes of it before a demand is made." *Regions Bank v. Wieder & Mastroianni, P.C.*, 526 F. Supp. 2d 411, 414 (S.D.N.Y. 2007), *aff'd*, 268 F. App'x 17 (2d Cir. 2008) (summary order). "Where the property is money, it must be specifically identifiable and be subject to an obligation to be returned or to be otherwise treated in a particular manner." *Key Bank v. Grossi*, 227 A.D.2d 841, 843 (N.Y. App. Div. 1996) (internal citation and quotation marks omitted).

## IV. DISCUSSION

Plaintiff brings one claim for conversion against Defendants CrediAuto and Gomez. *See* Compl. Both parties now move for summary judgment. *See* Doc. Nos. 31, 32. The Court addresses each motion in turn.

### A. Defendants' Motion for Summary Judgment

Defendants move for summary judgment, arguing that a cause of action for conversion cannot be predicated on a breach of contract, and that Plaintiff did not own or have a superior right of possession to the Converted Funds and did not suffer any damages. *See* Doc. No. 31-1 at 21–24.

#### 1. Conversion Predicated on Breach of Contract

It is well established in New York that a breach of contract claim may not be recast as a claim for conversion. *See Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 204 (S.D.N.Y. 2011); *MBL Life Assur. Corp. v. 555 Realty Co.*, 240 A.D.2d 375, 376 (N.Y. App. Div. 1997) ("It is settled, however, that a claim of conversion cannot be predicated on a mere breach of contract."). In order to determine whether a conversion claim is simply a contract claim, courts "look both to the material facts upon which each claim is based and to the alleged injuries for which damages are sought." *Ellington Credit Fund, LTD.*, 837 F. Supp. 2d at 204 (internal quotation marks omitted). Courts also consider whether the conversion claim is based on a wrong that is separately actionable. *See Briarpatch Ltd. L.P. v. Geisler Roberdeau Inc.*, 148 F. Supp. 2d 321, 328–29 (S.D.N.Y. 2001). Therefore, where a conversion claim is pleaded in the context of a contract, a plaintiff must prove not only the elements of a conversion, but

also an actionable wrong that is separate from the contract.  *See Citadel Mgmt., Inc. v. Telesis Trust, Inc.*, 123 F. Supp. 2d 133, 148–49 (S.D.N.Y. 2000).

As an initial matter, it is undisputed that Gomez is not a signatory to the Credit Agreement.  DSS No. 7.  As such, Plaintiff's conversion claim against Gomez is independent of the Credit Agreement and therefore not precluded under New York law.  *See, e.g.*, *Wells Fargo Bank, N.A. v. Nat'l Gasoline, Inc.*, No. 10-CV-1762 (RER), 2013 U.S. Dist. LEXIS 26712, at *15–16 (E.D.N.Y. Feb. 26, 2013) (applying New York law and concluding that "Plaintiff's conversion claims are independent of the Credit Agreement because the Conversion Defendants are not signatories to the contract.").  Accordingly, the Court **DENIES** Defendants' motion for summary judgment on this basis.

Turning to CrediAuto, the Court similarly finds that Plaintiff's conversion claim is not merely duplicative of a breach of contract claim.  As noted, under New York law, the question turns on whether CrediAuto engaged in conduct separate and apart from its contractual obligations that would give rise to a tort cause of action outside the Credit Agreement.  *See Jaybar Realty Corp. v. Armato*, 175 A.D.3d 1391, 1394, (N.Y. App. Div.) (citing *Greater Bright Light Home Care Servs., Inc. v Jeffries-El*, 151 A.D.3d 818, 824 (N.Y. App. Div. 2017)).

In order to determine whether CrediAuto engaged in conduct beyond a mere breach of contract, it is necessary to discuss the relevant alleged breach.[4]  It is undisputed that the purpose of the Credit Agreement was to enable AI Causa to purchase existing RICs and to originate new RICs.  PSS No. 8.  Pursuant to the Credit Agreement, CrediAuto was responsible for the servicing obligations associated with the RICs and

---

[4] Plaintiff puts forth a number of additional alleged breaches.  First, Plaintiff AI suggests that CrediAuto breached the Credit Agreement by not paying "its own liabilities and expenses [ ] out of its own funds." PSS No. 14.  However, the quoted covenant was not made by CrediAuto.  Credit Agreement Section 6(b)(xvii)(R).  Further, the two remaining alleged breaches pertain to recordkeeping provisions, which are not relevant to the present inquiry.

originations of new RICs on AI Causa's behalf.  *See* DSS No. 11.  It is also undisputed that the Loan Funds were used to purchase the RIC Portfolio on AI Causa's behalf.  DSS No. 14.  The RIC Portfolio generated proceeds, and the Credit Agreement specified the order in which the proceeds of the RIC Portfolio were to be distributed.  *See* Credit Agreement Section 2(j).  At the eighth priority, section 2(j)(viii) authorized "any remaining amounts" to be distributed to AI Causa, as the Borrower, "to fund the acquisition of any Eligible Assets pledged as Collateral."  Credit Agreement Section 2(j)(viii).  It is undisputed that "Eligible Assets" refers to qualified RICs.  DSS No. 19.  Importantly, it is also undisputed that amounts (*i.e.*, the Converted Funds) distributed pursuant to this subsection were used to pay CrediAuto's operational expenses.  DSS No. 22.

     Under New York law,[5] the Credit Agreement is to be read as a whole and "undue emphasis" is not to be placed on particular words or phrases.  *Consedine v. Portville Cent. Sch. Dist.*, 12 N.Y.3d 286, 907 (2009).  Where contractual language is otherwise plain, the language "does not become ambiguous merely because the parties urge different interpretations in the litigation."  *Law Debenture Tr. Co. v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010) (internal quotation marks omitted) (collecting cases).  The Court finds that Section 2(j)(viii) is not ambiguous and the phrase "to fund the acquisition" is plain.  The Credit Agreement contains numerous provisions, elsewhere and in subsection (j), specifying how and when the parties would receive a distribution for example, to cover various types of expenses.  *See, e.g.*, Credit Agreement Section 2(j)(i).  Subsection (viii) contains no mention of expenses or CrediAuto.  AI Causa had

---

[5] Under New York law, "[w]here the intention of the parties may be gathered from the four corners of the instrument, interpretation of the contract is a question of law, and . . . no trial is necessary to determine the legal effect of the contract . . . .  Mere assertion by one that contract language means something to him, where it is otherwise clear, unequivocal and understandable when read in connection with the whole contract, is not in and of itself enough to raise a triable issue of fact."  *Fed. Deposit Ins. Corp. v. Herald Square Fabrics Corp.*, 81 A.D.2d 168, 180 (N.Y. App. Div. 1981) (internal citations and quotation marks omitted).

no employees, no overhead, and no operating expenses.  Gomez Depo. II 79:11–14.  If the parties had contemplated that under subsection (viii), AI Causa would receive a distribution to cover CrediAuto's expenses, such would have been stated.  Again, the purpose of the agreement was for Plaintiff AI to provide AI Causa the funds to purchase and originate RICs.  PSS No. 8.  And CrediAuto was contractually entitled to receive a distribution to cover servicing fees earlier in the waterfall distribution.  *See* Credit Agreement Section 2(j)(iii), (iv); PSS No. 21.  It naturally follows that pursuant to subsection (viii), AI Causa was required under the Credit Agreement to use the distribution to "acquire" new RICs either by way of purchase or origination.  Consequently, the Court rejects Defendants' suggestion to the contrary.  *See* DSS No. 20.

Section 2(j)(viii) of the Credit Agreement required AI Causa to use its distribution from the RIC Portfolio proceeds to purchase or originate RICs.  *See* Dixon Decl. Ex. K ("Devito Depo.") 30:3–20.  As will be discussed in further detail below, there is a genuine issue of material fact as to whether there was any distribution or transfer between CrediAuto and AI Causa pursuant to section 2(j)(viii).  Nonetheless, Defendants have not demonstrated that any action taken by CrediAuto amounted to nothing more than a breach of contract.

AI Causa's failure to use the funds consistent with the terms of the Credit Agreement would result in a breach of contract, potentially prohibiting AI from bringing a claim for conversion against AI Causa under New York law.  However, AI Causa is not a defendant in this action.  Assuming the Credit Agreement required CrediAuto to affect the distribution at section 2(j)(viii), CrediAuto's failure to distribute the "remaining funds" to AI Causa would similarly be a breach, of which a conversion claim may be duplicative.  However, viewing the evidence in Plaintiff's favor, CrediAuto's receipt or retention of the Converted Funds and subsequent use of that money as its own, to cover its own operating expenses, is not a mere breach of section 2(j)(viii) of the Credit Agreement but is a separate, actionable wrong.  The Court therefore **DENIES** Defendants' motion on this basis.

1

### 2. Ownership or Superior Right to Possession

2 As noted above, in order to succeed on a cause of action for conversion, Plaintiff

3 AI must establish that it had legal ownership or an immediate superior right of possession

4 to the Converted Funds. *See Meese v. Miller*, 79 A.D.2d 237, 242 (N.Y. App. Div.

5 1981). Defendants maintain that Plaintiff had neither. *See* Doc. No. 31-1 at 23. In

6 opposition, AI asserts that it had a security interest in all of AI Causa's assets, including

7 all proceeds from RIC Portfolio, which includes the Converted Funds. *See* Doc. No. 36

8 at 25.

9 As an initial matter, there is no evidence that either CrediAuto or Gomez had any

10 ownership interest in the Converted Funds or that Plaintiff's right to immediate

11 possession was inferior to theirs. This would appear fatal to Defendants' argument as the

12 issue of Plaintiff's ownership or right to possession would seem to be *vis-à-vis* them, not

13 AI Causa. *See Bank of Am., N.A. v. Jacobi Tool & Die M.F.G., Inc.*, No. 17-cv-6828

14 (SFJ)(AKT), 2019 U.S. Dist. LEXIS 130653, at *19 (E.D.N.Y. Aug. 5, 2019) (applying

15 New York conversion law and noting that where a debtor is the lawful owner of collateral

16 to which the creditor has a secured interest, the creditor must establish that "its security

17 interest, versus the Defendant's ownership rights, gives it an immediate superior right of

18 possession to the Collateral"); *cf. Bank of Am., N.A. v. City View Blinds of N.Y.*, 2022

19 U.S. Dist. LEXIS 33558, at *17 (S.D.N.Y. Feb. 25, 2022) ("[T]he conversion claim fails

20 because, notwithstanding BofA's security interest in the Collateral, BofA has not

21 established that its right of possession is superior to that of Defendants."). Nor have

22 Defendants demonstrated by the undisputed evidence that CrediAuto had authorized

23 possession of the Converted Funds at any time.

24 That said, Defendants are correct that at the time of the alleged conversion, AI

25 Causa was the lawful owner of the RIC Portfolio and its proceeds including the

26 Converted Funds, not Plaintiff AI. *See* Caroprese Depo. 33:16–21. Regarding Plaintiff

27 AI's interest in the Converted Funds as collateral, the Credit Agreement states, in

28 relevant part:

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## SECTION 3.        SECURITY INTEREST; REMEDIES

(a) <u>Grant</u>. As collateral security for the prompt payment in full and performance when due (whether at stated maturity, by acceleration, by liquidation or otherwise) of the Borrower's obligations to the Secured Parties hereunder and/or under the other Transaction Documents (collectively, the "<u>Secured Obligations</u>"), the Borrower hereby pledges to the Collateral Agent on behalf of the Secured Parties and grants to the Collateral Agent on behalf of the Secured Parties a first priority continuing security interest in, lien on and right of set-off against, all of the Borrower's right, title and interest in, to and under, all assets of the Borrower, in each case, whether now owned or existing, or hereafter acquired or arising and wherever located, including, without limitation, (a) the Assets, (b) the Accounts, all funds and other property on deposit therein or credited thereto, and any income from the investment of funds therein, (c) all accounts, chattel paper, deposit accounts, financial assets, general intangibles, instruments, investment property, letter of credit rights and other Supporting Obligations relating to the foregoing (in each case as defined in the UCC), (d) the Borrower's ownership interest in and rights in all of its direct or indirect subsidiaries and the Borrower's rights under any agreement with any of its Affiliates, (e) all of the Borrower's rights (including, but not limited to the Borrower's rights to enforce remedies) under the Transaction Documents to which the Borrower is a party, (f) all proceeds with respect to the foregoing (collectively, the "<u>Collateral</u>").

Credit Agreement Section 3(a).

Accordingly, Plaintiff AI is correct that the Credit Agreement grants AI, as the Collateral Agent, a security interest in all of AI Causa's assets, as the Borrower, including proceeds.  It is undisputed that AI Causa's assets consisted of the RIC Portfolio, *see* PSS No. 16, and the Converted Funds were proceeds from the RIC Portfolio.  Accordingly, AI had a security interest in the Converted Funds.

The question then is whether AI's security interest amounted to an immediate right to possession of, or other sufficient interest in, the Converted Funds.[6]  As will be

---

[6] There is no apparent dispute that Plaintiff's interest in the Converted Funds is pursuant to UCC Article 9.  And pursuant to Article 9, a secured creditor undoubtedly has an immediate possessory interest in collateral after defaults.  *See* U.C.C. § 9-606; *see also, e.g.*, *Bank of India v. Weg & Myers, P.C.*, 257 A.D.2d 183, 191 (N.Y. App. Div. 1999) (finding that as a secured creditor, the plaintiff had a "superior

discussed in further detail below, there is a genuine issue of material fact as to who had possession of the Converted Funds at the moment of the alleged conversion. For that reason, the Court cannot conclude as a matter of law that Plaintiff's security interest in the Converted Funds was not a possessory interest superior to any interest Defendants may have had. Accordingly, the Court **DENIES** Defendants' motion for summary judgment on this basis.

### 3. Damages

Finally, Defendants argue that AI suffered no damages. Doc. No. 31-1 at 24. However, Plaintiff AI has put forth evidence that it suffered damages. AI's expert Brandon Caroprese testified that the Converted Funds were not reinvested as they should have been under the Credit Agreement and that this left AI at a deficit. Caroprese Depo. 24:1–18. He further testified that under the Credit Agreement, the Converted Funds should have either been in AI Causa's bank account or spent to acquire RICs. Caroprese Depo. 26:19–24. Had either scenario taken place, AI had a security interest in those assets as collateral: either the money itself in a bank account or the RICs purchased in the reinvestment and their proceeds. It is undisputed that the Converted Funds were neither in AI Causa's bank account nor reinvested. DSS No. 22.

And in any event, damages is not an element of a prima facie case of conversion under New York law. *See Cargill Soluciones Empresariales, S.A. De C.V., SOFOM, E.N.R. v. Desarrolladora Farallon S. de R.L. de C.V.*, 2017 NY Slip Op 31650(U), ¶ 10 (Sup. Ct.) ("[E]ven if no actual damages were suffered, damages are not an element of a conversion claim."). Consequently, even assuming that Plaintiff does not have evidence to prove damages, Defendants are not entitled to judgment as a matter of law as to

---

property interest" in proceeds of collateral after default and granting summary judgment in the plaintiff's favor on a claim for conversion). However, here the conversion is alleged to have occurred prior to the default, and so Article 9 does not create an immediate right to possession.

liability on this claim.  Accordingly, the Court **DENIES** Defendants' motion on this basis.

Defendants also argue that AI is unlawfully attempting a double recovery on the Credit Agreement debt.  *See* Doc. No. 31-1 at 24.  Defendants are correct that in New York, "[i]t is well established that a creditor is entitled to one satisfaction of [its] debt and no more."  *Five Star Bank v. CNH Capital Am.*, 55 A.D.3d 1279, 1282 (N.Y. App. Div.) (internal quotation marks omitted) (collecting cases).  Further, it is undisputed that following default, Plaintiff AI acquired the collateral by way of a UCC strict foreclosure. DSS No. 29.

The Notice of Proposal identifies AI Causa and CrediAuto as the Debtors under the Credit Agreement.  Gomez Decl. Ex. F.  It further states that AI Causa and CrediAuto were in default under the Credit Agreement and that Plaintiff AI was owed "at least $3,300,000.00."  *Id.*  Pursuant to UCC Section 9-620, AI proposed to retain the collateral in full satisfaction of the debt.  *Id.*  The record reveals that AI Causa and CrediAuto did not object, DSS No. 29, and therefore that AI acquired the following collateral: (1) AI Causa's RICs; (2) CrediAuto's Bank of America account established in its capacity as servicer; (3) CrediAuto's 100% equity interest in AI Causa; (4) 100% equity interest in CrediAuto; and (5) all of CrediAuto and AI Causa's personal property (subject to specific exclusions of leased premises, equipment, and cars in which AI did not have a lien).  *Id.* By its plain language, this collateral was taken "in full satisfaction" of the debt, which is described as the "obligations due" under the Credit Agreement.  *Id.*

Although this evidence is in the record and is undisputed, Defendants have not met their burden of establishing that Plaintiff's conversion claim fails as a matter of law for this reason.  The two cases Defendants cite in support of this argument are inapposite as they involved the discharge of a mortgage by a foreclosure, and the attempt by the mortgagee to recover from an insurance company under a policy taken out on the mortgaged property after bidding the full amount of the debt.  *See Whitestone Sav. & Loan Asso. v. Allstate Ins. Co.*, 28 N.Y.2d 332 (1971); *Alaimo v. First Fed. Sav. & Loan*

*Ass'n*, 52 A.D.2d 251 (N.Y. App. Div. 1976).  But for the rule in both that "a mortgagee is entitled to one satisfaction of his debt and no more," *Whitestone*, 28 N.Y.2d at 335, these cases have no application to the present facts.  And neither of these cases have ever been cited for the proposition that a secured creditor may not recover for an intentional tort such as conversion that took place prior to a UCC foreclosure satisfying the tortfeasor's obligations under a security agreement.

The Court has scoured New York caselaw and has failed to come across any cases on point.  The only case remotely instructive is that of *Langenbach v. Cuozzo*, No. 604002/06, slip op. 33441(U) (N.Y. Sup. Ct. Dec. 24, 2008).  In *Langenbach*, one New York court found that a claim for conversion was proper for dismissal on summary judgment where the plaintiff, a secured creditor, had already recovered the proceeds of the secured property.  *Id.* ¶ 6. ("It is well established that a creditor is entitled to one satisfaction of [its] debt and no more [internal quotation marks and citation omitted].") (quoting *Five Star Bank v CNH Capital America, LLC*, 55 A.D.3d 1279, 1282 (N.Y. App. Div. 2008) (internal quotation marks omitted)).  At issue in *Langenbach*, however, was collateral in the form of equipment allegedly converted after default by way of an auction.  *See id.* ¶ 2.  The facts in *Langenbach* are distinguishable from the present case because here there is no dispute that the alleged conversion by CrediAuto and Gomez took place prior to default and foreclosure and similarly, that the collateral acquired by AI in the foreclosure did not include the Converted Funds.

Consequently, Defendants have not carried their burden on summary judgment of demonstrating that satisfaction of AI Causa and CrediAuto's obligations under the Credit Agreement via strict foreclosure also served to indemnify CrediAuto and Gomez from liability for committing an intentional tort such as conversion prior to default.  The Court therefore **DENIES** Defendants' motion on this basis.

**B.    Plaintiff's Motion for Summary Judgment**

Plaintiff also moves for summary judgment on its conversion claim as to both Defendants.  As noted above, under New York law, "[i]n order to establish a cause of

action to recover damages for conversion, the plaintiff must show legal ownership or an immediate superior right of possession to a specific identifiable thing and must show that the defendant exercised an unauthorized dominion over the thing in question to the exclusion of the plaintiff's rights." *World Ambulette Transp. v. Kwan Haeng Lee*, 161 A.D.3d 1028, 1030–31 (N.Y. App. Div. 2018); *see also Petrone v. Davidoff Hutcher & Citron, LLP*, 150 A.D.3d 776, 777 (N.Y. App. Div. 2017) ("A conversion takes place when someone, intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession."). Consequently, the "[t]wo key elements of conversion are (1) plaintiff's possessory right or interest in the property and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's right." *Pappas v. Tzolis*, 20 N.Y.3d 228, 234 (2012).

"Interference with a right of possession is the essence of a conversion," *Meese*, 79 A.D.2d at 242, and "[t]angible personal property or *specific money* must be involved," *Nat'l Ctr. for Crisis Mgmt. v. Lerner*, 91 A.D.3d 920, 921 (N.Y. App. Div. 2012) (emphasis in original); *see also Petrone*, 150 A.D.3d at 777 ("Money, if specifically identifiable, may be the subject of a conversion action.").

"Conversion occurs when funds designated for a particular purpose are used for an unauthorized purpose." *World Ambulette*, 161 A.D.3d at 1031. "Where the property alleged to have been converted is money, it must be specifically identifiable and be subject to an obligation to be returned or to be otherwise treated in a particular manner." *E. Schodack Fire Co. v. Milkewicz*, 140 A.D.3d 1255, 1256 (N.Y. App. Div. 2016); *see also LoPresti v. Terwilliger*, 126 F.3d 34, 41–42 (2d Cir. 1997) ("It is well-settled that an action will lie under New York law for conversion of money where there is an obligation to return or otherwise treat in a particular manner the specific money in question.").

As an initial matter, the parties did not brief the issue of whether the Converted Funds are sufficiently identifiable. However, it is undisputed that the Converted Funds were designated for a particular purpose. *See* PSS Nos. 34, 7; DSS No. 22. Nonetheless,

the Court finds that outstanding material factual issues as to each element of Plaintiff's conversion claim preclude summary judgment at this time.

As to the issue of Plaintiff's superior right to possession, Plaintiff summarily concludes that this element is established simply by virtue of its security interest in the Converted Funds as collateral. *See* Doc. No. 32-1 at 13. In support, Plaintiff AI cites to the case of *AMF, Inc. v. Algo Distributors*, 48 A.D. 2d 352 (N.Y. App. Div. 1975), which is instructive but not conclusive. There, the New York Appellate Division considered the question of whether a security interest amounts to an immediate possessory interest in proceeds of collateral. *Id.* at 357. In *AMF*, the plaintiff had "a security interest in the collateral and in the proceeds of any sale thereof." *Id.* The *AMF* court found that the security agreement created a right to immediate possession of the proceeds because the debtor was obligated to pay over the proceeds derived from the sale of the collateral upon request, and that such a request was made and refused. *Id.* In coming to this conclusion, the *AMF* court relied on *Independence Discount Corp. v. Bressner*, 47 A.D.2d 756 (N.Y. App. Div. 1975) and *Hinkle Iron Co. v. Kohn*, 229 N.Y. 179 (1920). As the *AMF* court summarized:

> Indeed, the facts as alleged by the plaintiff are strikingly similar to those present in *Independence Discount Corp. (supra)*. The creditor therein financed the purchase of inventory by the defendant corporation and, pursuant to a security agreement, obtained a security interest in the inventory and in the proceeds from any sale thereof. The inventory was subsequently sold and the proceeds were commingled with the general corporate funds of the debtor. The debtor thereafter went into bankruptcy. The creditor then instituted an action in conversion against the two principal officers and majority shareholders of the defendant corporation. We held that no cause of action in conversion existed. That decision, however, does not require a similar result in this case. The crucial distinction is to be found in the difference between the terms of the security agreements involved in these cases. The agreement in *Independence* did not impose upon the debtor the obligation to account for specific moneys derived from the sale of the inventory. Rather, it merely provided that upon such sale the debtor was to pay immediately "all amounts due [plaintiff] with respect to the Products financed * * * [thereunder]."

1
2

Unlike the case here, no specific fund from which the money owed to the creditor would be paid was intended to be created.

3
4
5
6
7
8
9
10
11
12
13
14
15

In fact, the case at bar comes within the ambit of the holding in *Hinkle Iron Co. v Kohn* (229 NY 179). In *Hinkle*, the defendant corporate president assigned to the plaintiff the sum of $ 4,500, representing part of a designated payment which was to become due to the corporation under a municipal contract. After the specific payment was made, it was deposited in the corporation's bank account. The defendant, however, disbursed all moneys in that account for general corporate purposes. In holding the corporate officer liable, the court stated (p 183): "The corporation received and deposited the assigned sum in a trust capacity, because the sum was equitably the property of the plaintiff, which the corporation, as the owner of the legal title, was authorized to receive and hold only for the purpose of delivery to the plaintiff. * * * The corporation could not lawfully appropriate it to another purpose." The security agreement here, and the trust relationship in *Hinkle*, imposed upon the debtor the obligation to hold specific moneys for the creditor and barred the debtor from disbursing those moneys for general corporate purposes. In this context, where a diversion of the proceeds occurs, the debtor *and the individual corporate officers who participated in the misconduct* are personally liable (see *Hinkle Iron Co. v Kohn, supra*; 4 Anderson, Uniform Commercial Code [2d ed], § 9-306:4).

16

*Id.* at 357–58 (emphasis in original).

17
18

The *AMF* court's analysis strongly suggests, if not conclusively establishes, that the question turns on the terms of the security agreement.

19
20
21
22
23
24
25
26
27
28

Turning to the facts at hand, it is undisputed that the Converted Funds were treated in a particular manner—used to pay CrediAuto's expenses, *see* DSS No. 22—which, as explained above, the Court finds was inconsistent with the parties' agreed-upon treatment of the money, *see* Credit Agreement Section 2(j)(viii).  And certainly "an action will lie under New York law for conversion of money where there is an obligation to . . . treat in a particular manner the specific money in question."  *LoPresti v. Terwilliger*, 126 F.3d 34, 41 (2d Cir. 1997).  However, as noted, the landscape of New York case law suggests that Plaintiff's right to immediate possession of the Converted Funds turns not merely on the failure to comply with the designated use of the property, but how and when Plaintiff is entitled to the property in question under the governing agreement.

Neither party argues that under the Credit Agreement, either CrediAuto or Gomez were to hold the Converted Funds solely pending delivery to Plaintiff AI, as was the case in *AMF*. Moreover, *AMF* does not stand for the proposition that Plaintiff AI's security interest in the collateral alone equates to an immediate possessory interest. And Plaintiff fails to direct the Court to the relevant evidence to establish if, when, and how, it was entitled to the Converted Funds under the Credit Agreement. As such, there is a genuine issue of fact as to whether Plaintiff AI had an immediate right to possession of the Converted Funds under the terms of the Credit Agreement.

Moreover, even assuming Plaintiff had an immediate possessory interest in the Converted Funds, there is a genuine issue of material fact as to whether either Defendants exercised dominion or control over it. The record is unclear as to who was in possession of the Converted Funds at the time of the alleged conversion, and what transfers or payments were made by whom, for what, and when. *See* Gomez Depo. II 80:10–13 (agreeing that "*[c]ertain amounts* that were due and payable on the loan portfolio held by AI CAUSA were paid into CrediAutoUSA accounts"). For example, the record does not demonstrate whether the Converted Funds were transferred to AI Causa—*i.e.*, whether AI Causa paid CrediAuto's expenses, or whether CrediAuto paid its own expenses from the money that was supposed to be distributed to AI Causa for reinvestment. Neither party offers any probative evidence on this point, for example, in the form of bank records, nor does either party make a definitive statement about what transpired. *See, e.g.*, DSS No. 22. To that end, Defendant Gomez's involvement is a triable issue of fact. While New York law is clear that a corporate officer who commits or participates in the tort, even in the course of his duties on behalf of a corporation, may be held individually liable for conversion, *see LoPresti*, 126 F.3d at 42; *see also Greenway Plaza Office Park-1, LLC v. Metro Constr. Servs.*, 4 A.D.3d 328, 329–30 (N.Y. App. Div. 2004) (noting that "if a director or officer commits, or participates in the commission of, a tort, whether or not it is also by or for the corporation, he is liable to third persons injured thereby" (collecting sources)), the record is unclear as to Gomez's actual, personal involvement in

any transfers of, or payments using, the Converted Funds.  For example, Gomez testified, and the evidence reflects, that he was involved in conversations where persons on AI's behalf began inquiring about the use of the RIC Portfolio proceeds.  Gomez Depo I 84:6–16; Gomez Depo. II 93–98.  And upon receiving an email from Vivek Nayar, an Arena Director, who specifically noted section 2(j)'s waterfall provision and stated that "Crediauto cannot use excess collections for general operating expenses including making sub note payments," Dixon Decl. Ex. P, Gomez directed CrediAuto's CFO to "stop new sub debt payments," *id.*; Gomez Depo. I 42:20–25.  However, a reasonable jury could view this evidence and conclude that Gomez had no prior involvement in the decision to make these payments, but was merely stepping in to stop them.

In sum, Plaintiff has not demonstrated that it is entitled to summary judgment as a matter of law, and there are too many issues of fact, particularly as to "who was in possession of the money and, more importantly, who and what it was used for," *see Parsons & Whittemore Enters. Corp. v. Schwartz*, 387 F. Supp. 2d 368, 374 (S.D.N.Y. 2005), for the Court to grant summary judgment at this time.  For these reasons, the Court **DENIES** Plaintiff's motion for summary judgment.

## V. CONCLUSION

Based upon the foregoing, the Court **DENIES** Defendants' motion for summary judgment and **DENIES** Plaintiff's motion for summary judgment.  Because this case must proceed to trial, the Court will issue a scheduling order, setting forth all trial-related dates and deadlines, in due course.

**IT IS SO ORDERED**.

Dated:  September 30, 2022

HON. MICHAEL M. ANELLO
United States District Judge